**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────────

TAMMY CALLAHAN, representative of
Kevin Callahan,
                                        Plaintiff,
        v.                                              No. 09-CV-1441
                                                            (TJM/DRH)
MICHAEL J. ASTRUE, Commissioner of
Social Security,
                                        Defendant.

─────────────────────────────────

**APPEARANCES:**                          **OF COUNSEL:**

MARK A. SCHNEIDER, ESQ.
Attorney for Plaintiff
57 Court Street
Plattsburgh, New York 12901

HON. RICHARD S. HARTUNIAN          KAREN T. CALLAHAN, ESQ.
United States Attorney for the           Special Assistant United States Attorney
    Northern District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

**MEMORANDUM-DECISION AND ORDER**

        Plaintiff Tammy Callahan brings this action on behalf of her deceased husband,

Kevin Callahan ("Callahan") pursuant to 42 U.S.C. § 405(g) seeking review of a

decision by the Commissioner of Social Security ("Commissioner") denying his

application for benefits under the Social Security Act.  Callahan moves for a finding of

disability and the Commissioner cross-moves for a judgment on the pleadings.  Dkt.

Nos. 9, 12.  For the reasons which follow, it is recommended that the Commissioner's

decision be affirmed.

## I. Procedural History

On February 1, 2006, Callahan filed an application for disability insurance benefits pursuant to the Social Security Act, 42 U.S.C. § 401 et seq. claiming an alleged onset date of December 13, 2005 with a date of last insured on December 31, 2005.  T. 18, 20.[1]  That application was denied on June 19, 2006.  T. 44-47.  Callahan requested a hearing before an administrative law judge ("ALJ") and a hearing was held on November 14, 2007.  T. 49-50;725-71.  In a decision dated November 28, 2008, the ALJ held that Callahan was not entitled to disability benefits.  T. 15-24.  On December 8, 2008, Callahan filed a timely request for review with the Appeals Council.  T. 12-13.  On December 18, 2009, after the Appeals Council had granted, received, and reviewed additional medical information from Callahan's counsel, the Appeals Council denied Callahan's request, thus making the ALJ's findings the final decision of the Commissioner.  T. 4-10.  This action followed.


## II. Contentions

Callahan contends that the ALJ erred in (1) failing to calculate properly  his date of last insured; (2) failing to conclude that Callahan's seizures met the listed requirements indicating a per se disability; (3) failing to consider properly the opinions of his treating physician; (4) finding that Callahan was not credible concerning his statements of disability; and (5) concluding that Callahan retained sufficient residual functional capacity (RFC) to perform work.  Additionally, Callahan contends that the

---

[1]"T." followed by a number refers to the page of the administrative record. Docket No. 7.

Appeals Council failed to consider and address properly  the relevant new evidence which Callahan provided to it.

### III. Facts

On April 5, 2010, Callahan, 41, died of cancer.  Dkt. No. 9 at 28.  Callahan obtained a four year college degree in business, graduating in 1991.  T. 72, 731. Previous work experience was primarily organized through a temp agency and included program coordinator at a senior center, customer sales of satellite dishes and cell phones, customer service positions, and retail.  T. 733-37.  Callahan alleges that he became disabled on December 15, 2005 due to epilepsy and the seizures which accompany the disease.  T. 49-50

### IV.  Standard of Review

### A. Disability Criteria

"Every individual who is under a disability shall be entitled to a disability. . . benefit. . . ."  42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.   Id. §

3

423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical

and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the

impairment is "based [upon] objective medical facts, diagnoses or medical opinions

inferable from [the] facts, subjective complaints of pain or disability, and educational

background, age, and work experience."  Ventura v. Barnhart, No. 04-CV-9018(NRB),

2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d

1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. §

404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity.  If he [or she] is not, the
> [Commissioner] next considers whether the claimant has a 'severe
> impairment' which significantly limits his [or her] physical or mental ability
> to do basic work activities.  If claimant suffers such an impairment, the
> third inquiry is whether, based solely on medical evidence, the claimant
> has an impairment which is listed in Appendix 1 of the regulations.  If the
> claimant has such an impairment, the [Commissioner] will consider him [or
> her] disabled without considering vocational factors such as age,
> education, and work experience; the [Commissioner] presumes that a
> claimant who is afflicted with a 'listed' impairment is unable to perform
> substantial gainful activity.  Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's severe
> impairment, he [or she] has the residual functional capacity to perform his
> [or her] past work.  Finally, if the claimant is unable to perform his [or her]
> past work, the [Commissioner] then determines whether there is other
> work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  The plaintiff bears the initial

burden of proof to establish each of the first four steps.  DeChirico v. Callahan, 134

F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry

progresses to the fifth step, the burden shifts to the Commissioner to prove that the

plaintiff is still able to engage in gainful employment somewhere.  Id. at 1180 (citing

Berry, 675 F.2d at 467).

## B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  Berry, 675 F.2d at 467.  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 USC § 405(g) (2006); Halloran, 362 F.3d at 31.

## V. Discussion

## A. Medical Evidence

### 1. Work History

Callahan did not engage in any substantial gainful activity since the onset of disability on December 15, 2005.  T. 20.

### 2. Medical Treatment through December 2005

Callahan's documented treatment with Dr. Azar began on February 26, 2004, when he complained of a head cold and dizziness and reported that he suffered from controlled partial seizures.  T. 150, 210.  On June 26, 2004, Callahan returned claiming that he was suffering from "'strange feelings in the head' as if he would have a seizure, though the seizure would not happen."  T. 160, 221.  Callahan was again noted to have seizures and be on medication, and also to have recently been experiencing increased stress dealing with custody and visitation issues surrounding his daughter.  T. 151, 160, 209, 221.  Follow up reports in August and September of 2004 showed that Callahan was doing well and would call as needed.  T. 151, 209.

In March 2005, Callahan called Dr. Azar as he was again experiencing seizures. T. 151, 209.  Callahan described them as thirty second episodes where he felt a loss of the sense of time, followed by a headache.  T. 148, 208.  As of March 21, 2005, Dr. Azar continued to diagnose Callahan with partial complex seizures and referred him for an EEG.  T. 157, 220.  On April 13, 2005, Callahan's wife called Dr. Azar to report that Callahan had five seizures, in a row, on that day.  T. 148, 208.  The seizures where

characterized by Callahan being delirious, unfocused, and fatigued.  T. 149, 207.

Callahan was placed on medication.  Id.  On June 15, 2005, Dr. Azar received the EEG

results and reported to Callahan that his sleep and wake records were both within

normal limits and continued Callahan on prescription medication.  T. 156, 219.  On

October 26, 2005, Callahan was seen by Dr. Wolczynsk, reporting that he was feeling

fine and that his epilepsy was stable.  T. 170-71.


### 3. Medical Treatment After December 31, 2005

On January 12, 2006, Callahan returned to Dr. Azar complaining that he was

under stress, he was having seizures again, and his spells consisted of head shaking

and delirium.  T. 149, 207.  On January 24, 2006, Callahan left Dr. Azar a message,

asking him to write a letter on Callahan's behalf indicating that the stress had caused

several seizures.  However, on February 1, 2006, when Callahan returned to Dr.

Wolczynsk, he stated that his seizures were occurring intermittently, lasting for twenty

seconds at a time, and were subjectively classified as mild.  T. 167.  Dr. Wolczynsk

concluded that the levels of medication Callahan was taking for his epilepsy were

appropriate, and confirmed this conclusion with Dr. Azar.  T. 168.

On February 13, 2006, Callahan called Dr. Azar and complained that he was

having uncontrolled seizures which had been occurring since January 16, 2006, and

asked if Dr. Azar thought Callahan should undergo additional diagnostic testing.  T.

146, 205.  Callahan also stated that his seizures still consisted of staring spells, which

had been observed by himself, and Dr. Azar and Dr. Wolczynsk again conferred and

determined to increase the doseage of Callahan's medication.  Id.  Callahan had four

additional appointments with both Drs. Azar and Wolczynsk prior to the Disability

Determination on April 19, 2006 during which Callahan's medication levels were

continually being stabilized.  T. 146, 147, 163-66, 205, 206.

On April 19, 2006, Dr. Azar completed a Disability Determination where he

explained that Callahan had a diagnosis of partial complex seizures that were expected

to continue throughout Callahan's lifetime.  T. 139-45.  Callahan was noted to have no

ambulatory, motor, sensory, mental, or communicative issues.  T. 140-42.  Dr. Azar

noted that the 2005 EEG produced normal findings, Callahan was on medication to

treat his seizures, and that he had no real work limitations except to refrain from

"work[ing] on heights . . . driv[ing], . . . work[ing] on fast moving machinery or around a

pool or body of water."  T. 143-44.

On April 27, 2006, Callahan and his wife provided a seizure description stating

that Callahan "currently experiences non-convulsive seizures 5-7 times/day.  He

advised [he] was having as many as 10/day about 3-4 months ago."  T. 112-13.

According to Callahan's wife, the episodes lasted thirty to ninety seconds whereupon

Callahan appeared to be daydreaming and forgot what he was saying or doing.  Id.

While Callahan experienced no visual disturbances, he did have headaches after

having several seizures.  Id.  However, by May 17, 2006, Callahan's wife reported that

he had not recently been seeing his physicians because his seizures had decreased to

only one or two a day.  T. 109.

On June 5, 2006, Callahan's wife called Dr. Azar to report that, for the previous

week, he had been experiencing more seizures totaling about three to four per day.  T.

108, 206.  Dr. Azar ordered diagnostic tests and also requested additional medical

advice from a colleague.  T. 108, 193.  The second opinion indicated that "[l]ongitudinal medical evidence does not demonstrate intractable seizures that have not been able to be brought under control.  Neurologic exam is within normal limits. [Callahan] should observe seizure precautions."  T. 193.

On June 16, 2006, one of Dr. Azar's colleagues completed a physical RFC evaluation.  T. 194-99.  Callahan had no exertional, manipulative, visual, or communicative limitations.  T. 195-96.  Callahan was posturally limited because he could not ever climb ramps, stairs, ladders or scaffolding.  T. 195.  Additionally, Callahan was environmentally limited as he was unable to be around hazards such as machinery or heights.  T. 197.

On July 5, 2006, Callahan reported to Dr. Azar that he was having new symptoms accompanying his seizures, including "swooning spells" where he felt as if he had been spinning around very quickly and suddenly stopped.  T. 216.  Callahan felt that this was a different type of seizure because he was experiencing new feelings and headaches which he had never experienced before.  T. 215.

On October 30, 2006, Callahan was referred to neurologist Dr. LeComte.  T. 258-60.  Dr. LeComte noted that Callahan's last EEG was normal, his seizures had been well controlled on medication for many years, he felt he had break through staring spells, and his epilepsy was best controlled about a year and a half ago but he recently has been under a lot of stress with his custody disputes over his daughter.  T. 258.  Dr. LeComte stated that Callahan

> seems to not be able to handle a steady work regimen and
> has not returned to work over this time. [Callahan] has
> mentioned that he wants to claim disability for his epilepsy.

9

> However, he has admittedly not been disabled by this. He has not undergone neuro-psychiatric testing. He seems to think that he's having ten seizures a day of about five to ten seconds each. However, he has, unfortunately, no witness to that event here today.

T. 258. Dr. LeComte's impression was that, despite Callahan's reported decompensations since his normal EEG, "[t]here may . . . be a question of whether he actually has epilepsy . . . It appears as though he's looking for some disability, and at this point, I wouldn't support that as I think he's physically able to work." T. 260.

Callahan returned to Dr. LeComte on November 6, 2006, accompanied by his wife and reported witnessing the staring spells which occur once or twice a week. T. 256. Dr. LeComte still maintained that, despite the conflicting diagnoses in his record, "he needs to see that he is normal enough to work but he may have a learning or organizational disability that keeps him from succeeding in his work despite normal intelligence . . . ." T. 257. On December 4, 2006, Dr. LeComte again evaluated Callahan and stated that the conflicting evaluations in Callahan's medical records regarding his diagnosis and what specific type of seizure he is suffering is impinging upon the ability to arrive at a clear diagnosis. T. 255. Thus, Callahan was to continue receiving medication, on which he had exhibited the best results for seizure control. T. 254-55.

On February 5, 2007, Callahan reported no seizure episodes to Dr. LeComte and was characterized as doing well. T. 250-52. This continued until June 12, 2007, when Callahan returned complaining of difficulty sleeping and resulting headaches from his insomnia. T. 247. On August 7, 2007, Callahan returned, reporting better sleep patterns but still suffering from panic attacks during the day and seeking Dr. LeComte's

assistance by writing him a letter indicating that his seizures precluded him from working.  T. 244.  Dr. LeComte was "concerned that these [episodes] may not indeed represent . . . seizures," wanting more evidence before classifying his episodes as "uncontrolled."  T. 245.  Callahan's next appointment on September 18, 2007 was unremarkable.

On November 6, 2007, Callahan reported that a few weeks prior to the appointment he had become weak in his legs, had slurred speech, experienced difficulty with fine motor movements, and was dizzy and suffering from headaches.  T. 238.  On October 31, 2007, Callahan experienced multiple seizures in one day and continued having repeated seizures the following day as well.  T. 238.  Upon examination, Callahan still felt weak and uncoordinated, reported the onset of seizures triggered by the use of his computer, and stated continued feelings of panic and anxiety.  T. 238-39.  Dr. LeComte was still "not totally convinced that [Callahan] . . . ha[s] seizures at all . . . think[ing] these episodes are either panic or basilar type migraine[s]."  T. 240.

On January 22, 2008, Callahan underwent another EEG after being admitted to the hospital.  T. 264-65, 268-75.  The results of the EEG were abnormal, indicating a "[d]iagnostic of an atypical absence epilepsy with fast generalized spike wave bursts consistently associated with [Callahan's] . . . reported transient cognitive dysfunction." T. 266.  The following day Callahan also underwent an epilepsy monitoring study whereupon it was noted that Callahan had numerous fast generalized spike wave bursts which were resolved within fourteen minutes upon providing him with a specific medication.  T. 266.  Callahan was discharged on January 23.  T. 262-63.

On February 15, 2008, Callahan had a psychiatric evaluation with Dr. Brett Hartman.  T. 328-32, 709-13.  Callahan reported no feelings of depression, more so of frustration and discouragement over his present situation and his occasional feelings of dizziness and disorientation.  T. 329, 710.  Dr. Hartman concluded that Callahan could (1) follow and understand simple directions, instructions, and rote tasks, (2) make appropriate decisions, (3) fairly learn new tasks, and (4) with mild difficulty, maintain his attention, concentration, and a regular schedule, as well as perform complex tasks independently and appropriately deal with the stress normally associated with life.  T. 331, 712.  Dr. Hartman also filled out a mental RFC evaluation in which he determined that Callahan had (1) no limitations in his ability to understand, remember, and execute simple tasks or make simple decisions, (2) mild limitations in his ability to understand and remember complex tasks or make complex decisions, and (3) moderate limitations in his ability to execute complex tasks.  T. 333, 714.  However, Callahan had no limitations regarding his ability to interact appropriately with the public or coworkers.  T. 334, 715.

On September 10, 2008, Dr. Nagle wrote a letter explaining that Callahan had been referred to him by Dr. LeComte and concluded that "he had continued seizures despite several medication trials . . . " and although he had done well on his new seizure medicine, his "epilepsy diagnosis is beyond dispute and would be easily recognized by any serious evaluation of his history, EEG findings and response to medications . . . ."  T. 340-41.  On December 1, 2008, Dr. LeComte also provided a letter stating that

> [g]iven the persistent brief lapses of consciousness that Mr.

> Callahan was experiencing during the time he was
> inadequately treated for what would be discovered to be
> active epilepsy, he would have not been able to sustain
> attention to complete tasks properly . . . His attacks were
> most provoked by computer work, and given his background
> in such, he surely would have ha[d] many episodes while
> working. . . Therefore he would not have been able to work
> during the period that he has complained of these episodes,
> ranging back almost 15 years.  Indeed, this may have been
> responsible for his inability to hold a steady position during
> this period.

T. 719.  On April 3, 2009, Dr. Azar also completed a letter outlining his treatment history

with Callahan.  T. 721-22.  Dr. Azar continued the medication protocol initiated prior to

March 2003 by Dr. Nagle, indicating that Callahan lost the ability to drive safely and

also experienced increased anxiety and panic while under his care, though both were

also treated with medication.  T. 721.


### B. Callahan's Testimony

Callahan filed multiple applications for disability benefits.  T. 59-83, 83-89, 92-

107.  Callahan asserted in his disability appeal that his seizures had improved,

occurring less frequently since April of 2006.  T. 114-120.

On November 14, 2007, Callahan testified during his hearing.  T. 725-753.

Callahan discussed his prior employment, indicating that he did not work in 2002 and

2003 due to his seizures.  T. 737.  Callahan indicated that his medical condition

worsened drastically after experiencing a "horrible episode, extremely bad" in October

2007.  T. 737-38.  Callahan testified that, of late, he was precluded from performing

housework and chores and being around flashing or non-natural light because it would

induce his seizures and headaches, which had not previously been the case.  T. 742-

13

47.


### C. Expert Testimony

### 1. Vocational Expert

During the November 14th hearing, a vocational expert ("VE") also testified.  The VE indicated that, given Callahan's age at the time of the hearing, and the facts presented in his physical RFC evaluation, Callahan could still perform his prior work as a general clerk, a hotel/motel clerk, any of his prior office positions, or his position as a sales representative.  T. 761-62.  If he could only glance at a computer screen for a few minutes at a time for a total of an hour or two a day, Callahan could still perform his prior employment as a motel clerk, or could obtain other employment as an information or account clerk.  T. 764-65.  Given the same restrictions, with the additional prohibition of looking at a computer screen, the VE indicated that he would not be able to engage in his prior work, but could still engage in gainful activity including occupations as a file clerk or housekeeper.  T. 762-63.  Even if Callahan could not look at a computer and experienced one or two staring spells per day, he could still perform work as a housekeeper or file clerk.  T. 765-66.  These positions are also low stress positions, thus they would not serve to aggravate someone whose seizures were provoked by stress.  T. 766-67.  Lastly, assuming additional restrictions of having limited abilities to concentrate and upwards of ten staring spells a day, the job of housekeeper would still be available to the individual.  T. 767-68.  However, a total inability to perform fine motor skills and manipulations or remember instructions would foreclose all

employment possibilities.  T. 768-69.

## 2. Medical Expert

On June 17, 2008, a medical expert testified regarding the diagnostic testing Callahan underwent, including his atypical EEG.  T. 772-90.  The expert, Dr. Willer, found that the explanation of the EEG was incorrect.  First, Dr. Willer took exception to the fact that Callahan's events were characterized as "atypical absence seizures" as atypical generally refers to a characterization of mental retardation or the like.  T. 779. Additionally, Dr. Willer explained that epilepsy is generally characterized by a different spike and wave pattern than that exhibited by Callahan's EEG, as those rapid wave patterns that Callahan had are generally seen in myoclonic epilepsy which has additional symptoms of grand mal seizures and convulsions, both of which Callahan has never experienced.  T. 780.  Moreover, Callahan's statements that he attempts to fight off his oncoming seizures were curious as there was no way to prevent an absence seizure to occur.  T. 781.  Accordingly, Dr. Willer concluded that Callahan's feelings and spells are most likely not associated with epilepsy.  Id.  Those suffering from absence seizures also generally do not have ten seizures per day.  T. 784. Additionally, given the lack of specificity with the duration and frequency of Callahan's spells, it was difficult to quantify them and made the Listings inapplicable.  T. 781-83.

Furthermore, people who experience absence seizures generally did not also suffer from headaches or complain of any problems with memory.  T. 785, 787.  This further supported Dr. Willer's opinion that Callahan's episodes were not epilepsy but something else.  T. 787.  Lastly, Dr. Willer asserted that it was impossible to prove

15

whether an absence seizure occurred while Callahan was sleeping based on his own subjective reports as he would be unaware that he was actually having the seizure, were it to occur, because he would be asleep at the time of its occurrency.  T. 788.

Callahan's attorney asked the ALJ if he would also hear testimony from Dr. Nagle, the physician that treated Callahan prior to Dr. Azar and after Dr. LeComte.  The ALJ determined that there was no need for Dr. Nagle to testify because "[t]he treating source was credited for establishing that [Callahan's] seizure disorder . . . is . . . severe . . . Dr. Nagle did not state an opinion as to the severity of this impairment as of the date last insured . . . and, of greatest importance, . . . Dr. Nagle was not treating [Callahan] at that time."  T. 18.

### D. Calculating Date of Last Insured

To be eligible for disability insurance benefits, an applicant must be "insured for disability . . . benefits."  42 U.S.C. § 423(a)(1)(A).  Being insured requires that an individual accumulate the requisite number of "quarters of coverage."  Id. § 423(c)(1)(B); see also 20 C.F.R. §§ 404.120- 404.140.  The date last insured ("DLI") "is the last day in the last quarter [of coverage] when disability insured status is met."  SSA - POMS: RS 00301.148.  "Generally, if a person otherwise eligible to receive [disability] becomes disabled prior to their date last insured, they receive . . . benefits until . . .: death, retirement . . . or termination of the disability."  Dutcher v. Astrue, No. 09-CV-1161 (LEK/VEB), 2011 WL 1097860, at *9 (N.D.N.Y. April 29, 2011ar. 7, 2011) (citing 42 U.S.C. § 423).  Conversely, if disability is not established prior to the date last insured, even if the individual is subsequently determined disabled, it "ha[s] the practical

16

effect of foreclosing receipt of any benefits . . . ."  Id., 2011 WL 1097860, at *2.

"The law requires that the applicant demonstrate that [he/]she has quarters of coverage . . . ." sufficient to establish the insured period.  Koffsky v. Apfel, 26 F. Supp. 2d 475, 479 (E.D.N.Y. 1998); see also 20 C.F.R. §§ 404.130-146 (explaining how disability insured status is determined and what constitutes a quarter of coverage).  The determinations made by the ALJ regarding a claimant's earnings, and correlating quarters of coverage, "may be corrected to eliminate errors, whether of inclusion or omission," for a period of "three years, three months and fifteen days following the end of any calendar year . . . ."  Koffsky, 26 F. Supp. 2d at 479 (citations omitted). "Following this limitations period, the Commissioner's records as to an individuals wages . . . shall be conclusive [and] . . . the absence of any entry . . . regarding the wages alleged to have been paid . . . shall be presumptive evidence that no such alleged wages were paid during that year."  Id. (citing 42 U.S.C. § 405(c)(4)).  In these cases, it is the claimant's burden to produce evidence supporting his or her claim that additional quarters of coverage are necessary based on incorrect wage information. See Raitport v. Apfel, 8 Fed. Appx. 118, 121 (2d Cir. 2001) ("[Claimant] has the burden of establishing that he had more than 36 quarters of coverage . . . and he failed to offer any credible evidence to rebut the SSA's records.") (citing Butts v. Sec'y of Health & Human Servs., 706 F.2d 107, 108 (2d Cir. 1983).

The record reflects Callahan's date of last insured in multiple places, including his initial denial of disability on June 19, 2006.  T. 47; see also T. 65 (disability report from field office dated February 9, 2006), T. 18 (ALJ's calculation of date of last insured).  Nine days after that denial, Callahan retained counsel.  T. 48.  This issue was

17

never disputed during the hearings or in counsel's letter to the Appeals Counsel.  T. 6
(letter from counsel stating his intention not to file a brief but expressing his
disagreement with the ALJ's conclusions pertaining to the treating physician rule, the
disability determination, the burden of proof at Step 5, and the credit given to Callahan's
testimony).  As it was Callahan's burden to produce evidence in order to amend his
earnings, and neither he nor his counsel provided such information, the findings of the
ALJ are considered conclusive.  Moreover, to the extent Callahan now claims that he
should have been credited for additional quarters of coverage as a result of his work
history between the years 2000-05, such claims are not supported by his own
testimony.  During the hearing, Callahan testified that he was unemployed for two of
those years, eroding his prior claims that his quarters of coverage were not
appropriately calculated and established.

Accordingly, the ALJ's calculation was supported by substantial evidence.
Moreover, Callahan's inability to establish a disability within that two week window will
prove fatal to receiving any disability payments.


**E. Severity**

Callahan contends that the ALJ failed to assess properly the severity of his
conditions.  The Commissioner contends that the ALJ properly evaluated the severity of
Callahan's impairments.

As mentioned above, step two of the sequential evaluation process requires a
determination as to whether the claimant has a severe impairment which significantly
limits the physical or mental ability to do basic work activities.  <u>See</u> subsection IV(A)

18

supra; 20 C.F.R. § 404.1521(a) (2003).  Where a claimant alleges multiple impairments,

the court will consider "the combined effect of all [] impairments without regard to

whether any such impairment, if considered separately, would be of sufficient severity."

Id. § 404.1523.  An impairment, or combination thereof, is not severe if it does not

impinge on one's "abilities and aptitudes necessary to do most jobs." Id. § 404.1521.

Basic work activities which are relevant for evaluating the severity of a physical

impairment include "physical functions such as walking, standing, sitting, lifting,

pushing, pulling, reaching, carrying, or handling. . . ." Id. § 404.1521(b)(1).

   "The Social Security regulations list certain impairments, any of which is

sufficient, at step three, to create an irrebuttable presumption of disability." DeChirico,

134 F.3d at 1180; see also 20 C.F.R. § 404.1520(d) (2003); Id. at pt. 404, subpt. P.

App. 1 (2003)(listing of per se disabling ailments).  Additionally, the regulations state

that "if an individual has an impairment that is 'equal to' a listed impairment," that

individual is disabled regardless of his or her age, education, or work experience.

DeChirico, 134 F.3d at 1180 (quoting 20 C.F.R. § 404.1520(d) (2003)).

   Callahan contends that his absence seizures[2] were sufficient to satisfy listing

11.03 and established an irrebuttable presumption of disability.  Epilepsy and

"nonconvulsive epilepsy" are establish pursuant to the listings if there is a

         documented . . . detailed description of a typical seizure

_____

   [2] "A petit mal seizure is the term usually given to a staring spell.  It is a brief
(usually less than 15 seconds) disturbance of brain function due to abnormal electrical
activity in the brain." Williams v. Astrue, No. 08-CV-4357, 2010 WL 2921509, at *3, n. 5
(E.D.N.Y. July 20, 2010) (citations omitted).  As Callahan's descriptions of his absence
seizures were identical to the definition of a non-convulsive petit mal seizure, that
section of the listings is the appropriate one to use.

> pattern, including all associated phenomena; occurring more
> frequently than once weekly in spite of at least 3 months of
> prescribed treatment.  With alteration of awareness or loss
> of consciousness and transient postictal[3] manifestations of
> unconventional behavior or significant interference with
> activity during the day.

See 20 C.F.R. pt 404, subpt P, App. 1 § 11.03.  The ALJ refused to credit Callahan's

impairment as a listed condition because the medical records lacked "specific findings .

. . [namely t]he frequen[cy] and duration of the seizures . . . ." and were also

inconsistent.  T. 21.

Prior to describing the seizures on April 27, 2006, four months after the date of

last insured, neither Callahan nor his wife provided a detailed description of the

seizures in the medical records.  Callahan began reporting his seizures in March 2005,

describing them as thirty second episodes where he felt a loss of time.  T. 148, 208.

That description failed to establish how often Callahan was having the seizures, which

is essential to meeting the listed requirement.  Additional description by his wife, on

April 13, 2005, stated that on that day Callahan had had five seizures in a row, which

consisted of him being delirious and unfocused.  T. 149, 207.  However, that also does

not indicate whether that many seizures represented a consistent daily, weekly, or

monthly exception.  Even after the date of last insured, the medical notes indicate

intermittently occurring, mild seizures which still manifested themselves as staring

spells.  T. 167.  This is insufficient to establish all the elements of the listing, as noted

by the ALJ.

---

[3] "Postictal means following a seizure."  Guy v. Astrue, 615 F. Supp. 2d 143, 162,
n. 18 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

Furthermore, Callahan's medical record was also inconsistent regarding the severity of the seizures.  Callahan has been consistently medicated for his seizures, and the record indicated that he sustains long periods of months to years where his seizures were well controlled.  During the time in question, Callahan indicated in April 2005 to Dr. Azar that his seizures were worsening.  T. 148-49.  The following month, Callahan received EEG results which were within normal limits.  T. 156, 219.  In October 2005, Callahan reported to Dr. Wolczynsk that his epilepsy was stable.  T. 170-71.  This continued until mid-January of 2006, after the date last insured, when Callahan reported to Dr. Azar that his seizures were becoming uncontrolled.  T. 146, 149, 205, 207.  However, such contentions are belied by Callahan's simultaneous and contradictory reports to Dr. Wolczynsk on February 1, 2006, when he stated that his seizures were intermittent and mild.  T. 167.

Additionally, the medical record is replete with opinions from both treating physicians and specialists questioning the severity of Callahan's seizures, further supporting the ALJ's conclusion.  Dr. LeComte's treatment records subsequent to the expiration of Callahan's insured status reveal that she did not support his quest for disability benefits in the Fall of 2006.  T. 257-58, 260.  When Dr. Azar sent Callahan for a second opinion in June 2006, subsequent yet close to the date of last insured, the doctor opined that the "[l]ongitudinal medical evidence does not demonstrate intractable seizures that have not been able to be brought under control."  T. 193.  Continued skepticism was also voiced at Callahan's hearing by the Commissioner's medical expert who testified that Callahan's subjective reports of the types, frequency, and ability to predict and assuage his seizures, as well as Dr. Nagle's diagnosis and explanation of

21

Callahan's epilepsy, were inconsistent with his medical opinion and experience relating to the treatment of epilepsy.  T. 779-90.

Therefore, substantial evidence supports the ALJ's findings that, as of the time surrounding the date last insured, there was insufficient evidence to meet the requirements of the listings.[4]

## F. Treating Physician Rule

Callahan contends that the ALJ failed properly to credit the opinions of his treating physicians, Drs. Azar, LeComte, and Nagle.

When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant.  Harris v. R.R. Ret. Bd., 948 F.2d 123, 126 (2d Cir. 1991).  Generally, more weight is given to a treating source.  Under the regulations, a treating source's opinion is entitled to controlling

---

[4] In the ALJ's decision he stated that "the claimant may, in fact, currently be disabled.  However, as mentioned above, the evidence of record does not support an established onset date at any time prior to December 31, 2005, the date the claimant's insured status expired.  According to the Regulations, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record."  T. 22.  Callahan's later medical records and testimony seem to point to distinct periods of decompensation.  The first was arguably in mid-January 2006.  T. 146, 205.  The second appears to be July 5, 2006, when Callahan began complaining of new symptoms accompanying his seizures.  T. 16.  The last seemed to be on October 31, 2007.  T. 238.  After the last episode, Callahan claims not to have felt the same since, and a few months later Callahan was hospitalized with abnormal (though disputed) EEG results.  T. 264-75, 772-90.  Whether the progression of the symptoms and subsequent documentation in the medical record is sufficient to establish a disability, however, is irrelevant because as discussed supra, if disability is established after the date of last insured, the claimant is foreclosed from receiving benefits.

weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2) (2005); Shaw, 221 F.3d at 134.  "This rule applies equally to retrospective opinions given by treating physicians."  Campbell v. Astrue, 596 F. Supp. 2d 445, 452 (D. Conn. 2009) (citations omitted).  Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons."  Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors."  Schaal, 134 F.3d at 503.  If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be given.  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999). Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner.  Id. at 133-34; see 20 C.F.R. § 404.1527(e) (2005).

Callahan does not claim that the ALJ relied upon other physician's opinions in error but that the ALJ failed to automatically conclude that Callahan suffered from a listed impairment based upon these retrospective treating opinions.  Callahan's Mem. of Law (Dkt. No. 9) at 17.  The ALJ did accord (1) the treatment records and disability determination completed by Dr. Azar great weight; (2) the treatment records of Dr. LeComte highly persuasive weight; and (3) Dr. Nagle's initial diagnosis of epilepsy great

23

weight.  For the reasons discussed below, though, even these opinions did not succeed in establishing a listed impairment.  Additionally, substantial evidence supported the ALJ's decision to grant each of these physicians' opinions the weight which he deemed they deserved.

### 1. Dr. Azar

In this case, the ALJ gave Dr. Azar's treatment notes through February 2006 and the disability determination that he completed in March 2006 the greatest weight.  T. 22-23.  These notes contain clinical and examination findings that include normal neurological findings, no muscle or gait abnormalities, normal sensory and mental status findings, and a normal EEG.  T. 140-42, 151, 156, 219.  Dr. Azar's notes after the date last insured indicated that Callahan's condition seemed to deteriorate on or about January 16, 2006 (T. 146, 205), but subsequent notes also indicate that with continued medication and modifications in doseages he functioned well for many months.

Much after he had concluded his treatment of Callahan, Dr. Azar provided the ALJ with a letter detailing his treatment of Callahan for his seizures.  T. 721-22.  Dr. Azar continued the medication which was initially prescribed by Dr. Nagle in March 2003, and explained that Callahan also lost the ability to drive and experienced anxiety and panic while under his care.  T. 721.  Callahan appears to contend that this letter establishes a disability per se.  The letter does confirm what Dr. Nagle diagnosed much earlier, that Callahan suffered from seizures.  This fact has never been disputed and was acknowledged by the ALJ when he categorized Callahan's condition as one which

was severe.  However, this letter does not add to the medical record already before the

ALJ but simply restates the facts already discussed.  Accordingly, the ALJ properly

accorded these medical records concurrent with the relevant time in question the

greatest weight in determining the severity of Callahan's seizures and their impact on

his RFC.

## 2. Dr. LeComte

Dr. LeComte, one of Callahan's neurologists, treated Callahan beginning almost

a year after his disability insured status had terminated.  Dr. LeComte's medical records

acknowledged that Callahan had multiple different diagnoses that required further

clarification to determine what he was truly suffering from and how best to treat it.  T.

240, 244-45, 250-52, 256-60.  Upon Callahan's first visit in October 2006, Dr. LeComte

opined that while Callahan was looking for disability benefits, "he has admittedly not

been disabled by this."  T. 258.  Additionally, in November 2006, Dr. LeComte again

stressed that Callahan was "normal enough to work," and commented on Callahan's

continued good results on medication and her intention to continue trying to pin point

what Callahan's precise malady was.  T. 254-57.  Callahan continued doing well and

reported no seizure activities through February 5, 2007.  T. 250-52.  Callahan then

reported trouble sleeping and persistent headaches, but did not report having any

remarkable symptoms with his seizures until November 6, 2007, after his subjectively

reported "horrible . . . extremely bad" episode.  T. 238, 244-47.  All of this information

was gathered after the date last insured, but was also considered to be highly relevant

to the ALJ's evaluation and determination of the status of Callahan's health in

December 2005.  T. 23.  These records, in conjunction with the treatment notes of Dr. Azar and the normal EEG findings, constitute substantial evidence to support the ALJ's findings.

Callahan again contends that a retrospective report submitted by Dr. LeComte on December 1, 2008 established his per se disabling condition.  Dr. LeComte stated that "he would not have been able to work during the period that he has complained of these episodes, ranging back almost 15 years."  T. 719.  This letter is completely contrary to the concurrent treating records Dr. LeComte authored, as well as the observations by other concurrently treating physicians and the diagnostic evidence at the time.  Based upon the inconsistency in this letter, it was not material evidence which would have altered the decision of the ALJ.  Accordingly, the ALJ's decision to rely on the concurrent medical records, even though they were outside of the disability insured period, was supported by substantial evidence.  Furthermore, the decision not to rely upon the subsequent retrospective letter is also supported by substantial evidence.

### 3. Dr. Nagle

Dr. Nagle treated Callahan prior to March 2003 and then again in September 2008.  T. 3401-41, 721.  Dr. Nagle was not involved in Callahan's treatment immediately prior, or subsequent to, his onset of disability or termination of insurance coverage.  Accordingly, the ALJ did not deem any of his treatment testimony relevant because it was outside of the period under consideration.  T. 18.  Moreover, to the extent Dr. Nagle's opinion about Callahan suffering from epilepsy was considered, it was given great weight as the ALJ agreed that Callahan's impairment was severe.

Callahan appears to again argue that because Dr. Nagle treated him for seizures and wrote a retrospective letter to that effect, it again establishes a <u>per se</u> disability. Based upon the substantial medical evidence in the record which was concurrent with the period in question, it is clear that was not the case and more than a statement of the diagnosis needed to be documented in order to qualify as a listed impairment. Moreover, Dr. Nagle's retrospective letter was similar to that of Dr. Azar's, outlining the treatment Callahan had undergone and stating the success Callahan experienced on his medication.  T. 340-41.  Accordingly, the ALJ's decision to give Dr. Nagle's diagnosis of epilepsy great weight, yet decide not to hear testimony about treatment outside of the relevant period and instead base his decision on the concurrent medical records, was supported by substantial evidence

## G.  Subjective Complaints of Pain

Callahan contends that the ALJ's failure to discuss his headaches and anxiety in combination with his seizures, as well as failure to consider the side effects of his seizure medication, was error as he failed to include an appropriate credibility assessment in his analysis.

The ALJ determines whether an ailment is an impairment based on a two-part test.  First, the ALJ must decide, based upon objective medical evidence, whether "there [are] medical signs and laboratory findings which show . . . medical impairment(s) which could reasonably be expected to produce [such] pain. . . ."  <u>Barringer v. Comm'r of Soc. Sec.</u>, 358 F. Supp. 2d 67, 81 (N.D.N.Y. 2005); 20 C.F.R. § 404.1529 (2003). This primary evaluation includes subjective complaints of pain.  20 C.F.R. § 404.1529

27

(2003).  "'Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.'" Barringer, 358 F. Supp. 2d at 81 (quoting Crouch v. Comm'r of Soc. Sec. Admin., No. 6:01-CV-0899 (LEK/GJD), 2003 WL 22145644, at *10 (N.D.N.Y. Sept. 11, 2003).

An ALJ must consider all symptoms, including pain, and the extent to which these symptoms are consistent with the medical and other evidence.  20 C.F.R. § 404.1529 (2003).  The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment.  See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1978).  The ALJ must consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

> (i)  [The claimant's] daily activities;
>
> (ii)  The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
>
> (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;
>
> (vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

28

> (vii) Other factors concerning [the claimant's] functional
> limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

In this case, the ALJ concluded that "there is nothing in the record to support a finding that [Callahan] had any other impairments of a severe level prior to the expiration of his insured status."  T. 21.  Callahan contends that both his anxiety and headaches should have been included in this severity analysis.  However, there is not substantial evidence in the medical record to support such contentions.

First, while Callahan was often noted to have anxiety and panic attacks, he was always medicated for these conditions.  The medication resulted in reports that Callahan was feeling "fine" on subsequent doctors visits in August and September of 2004 (T. 151, 209), October of 2005 (T. 170-71), and February of 2006 (T. 167).  Second, increases in stress and anxiety seemed consistently tied to his custody issues with his daughter, and did not result in any lingering feelings as his mental RFC evaluation revealed that he was generally frustrated and discouraged, but not depressed or anxious.  T. 151, 160, 209, 221, 329, 710.  Third, the mental RFC evaluation only indicated mild limitations and difficulty posed upon Callahan as result of dealing with levels of stress.  T. 331, 712.  This also supports the finding that any anxiety, alone or in combination with any of the other impairments, was insufficient to establish a severe condition.

Finally, Callahan's primary side effect from his seizure medication was weight gain.  While medical records refer to Callahan as being overweight, treatment of obesity was never a primary therapeutic concern.  Thus, it is questionable whether Callahan

29

was actually obese.  See S.S.R. 02-1P at *1 (instructing the "adjudicators to consider

[obesity and] its effects when evaluating disability . . . [as] the combined effects . . . with

other impairments can be greater than the effects of each of the impairments

considered separately.")  Even if he was obese, any failure to specifically discuss it was

harmless error.  See Skarbek v. Barnhart, 390 F. 3d 500, 504 (7th Cir. 2004)

(explaining that remand is inappropriate where claimant "d[id] not specify how his

obesity further impaired his ability to work, but speculates merely that his weight makes

it more difficult to stand and walk.").  Callahan never complained that his weight

affected any of his activities of daily living, and its effect on his life was never raised

until the current motion.  This is especially telling since Callahan took the medication for

decades, including the periods of time when he was previously employed.  T. 740.

"Additionally, the ALJ adopted the limitations suggested by the specialists and

reviewing doctors, who were aware of [Callahan's arguable] obesity.  Thus, although

the ALJ did not explicitly consider [it] . . ., it was factored indirectly into the decision . . .

." Id.

Therefore, the bases for the ALJ's credibility determination were supported by

substantial evidence.  The decision of the Commissioner on this ground should be

affirmed.


**H. RFC**

Callahan contends that there exists insufficient evidence in the record to support

the ALJ's findings regarding RFC.

RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations beyond the symptoms.  Martone v. Apfel, 70 F. Supp. 2d 145,150 (N.D.N.Y. 1999); 20 C.F.R.  §§ 404.1545, 416.945.  "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient."  Martone, 70 F. Supp. 2d at 150.  RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy.  New York v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960 (2003).  The Second Circuit has clarified that, in Step 5 of the Commissioner's analysis, once RFC has been determined "the Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's [RFC]." Pourpre v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

Here, the ALJ found that, based upon the medical records and Dr. Azar's disability determination report and subsequent RFC evaluations, Callahan retained the ability to perform his previous work as he had actually performed it in the past.  T. 24. This is primarily supported by Dr. Azar's disability determination report, completed months after the termination of Callahan's insurance period, which indicated that Callahan's only work restrictions were to refrain from "work[ing] on heights . . . driv[ing], . . . work[ing] on fast moving machinery or around a pool or body of water."  T. 143-44; see also 194-99 (RFC completed by Dr. Azar's colleague with incorporates same limitations).  Callahan's abilities to comply with such physical demands are demonstrated by the record whereupon he did not testify to major restrictions in his

abilities to engage in his activities of daily living or hobbies until his severe headaches began in October 2007.  T. 738, 742-47.  As discussed above, the diagnostic tests and Callahan's medical record through and immediately after his date of last insured also provide substantial evidence that his impairment was not of disabling severity.  Thus, all of the relevant evidence in the record supported the ALJ's RFC determination for the reasons outlined above.  20 C.F.R. § 404.1545(a)(1).  As these "fact[s are] supported by substantial evidence, [they are deemed] conclusive . . . ."  42 U.S.C. § 405(g).

The ALJ then conducted his Step Five analysis.  The ALJ may apply the Grids or consult a vocational expert ("VE").  See Heckler v. Campbell, 461 U.S. 458, 462 (1983); Rosa v. Callahan,  168 F.3d 72, 78 (2d Cir. 1999); 20 C.F.R. pt. 404, subpt. P, App. 2 (2003).  Here, a VE was questioned.  Based upon the uncontroverted RFC opinion, the VE provided testimony that Callahan could continue to perform his prior work as a general clerk, hotel or motel clerk, office worker, or sales representative.  T. 761-62.  This conclusion was consistent with the medical opinions and diagnostic tests and was not inconsistent with subjectively reported times that Callahan was feeling good.

Accordingly, the Commissioner's decision should be affirmed.


### I. New Evidence

Callahan contends that the Commissioner erred in not considering new evidence submitted to the Appeals Council.  The relevant pieces of evidence are the three retroactive reports from Drs. Azar, LeCompte, and Nagle.  T. 719-21.[5]

---

[5] Additional medical evidence was submitted in connection with Callahan's cancer diagnosis and treatment.

Pursuant to 42 U.S.C. § 405(g), "[t]he court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ." See also Lisa v. Sec'y Dep't of HHS, 940 F.2d 40, 43 (2d Cir. 1991). The Second Circuit has developed a three part test for new evidence, allowing supplementation of the record where evidence was "(1) 'new' and not merely cumulative of what is already in the record, . . . (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative . . ., [and (3) where there was] good cause for [claimant's] failure to present the evidence earlier." Id. (internal citations omitted).

As previously discussed, Dr. Azar's retrospective letter merely refers to the course of diagnosis and treatments he provided to Callahan while he was a patient. T. 721-22. As that is cumulative of the individual treatment records which were already provided and considered, the letter does not constitute new evidence. Dr. Nagle's letter serves to restate his epilepsy diagnosis. T. 340-41. As previously discussed, this diagnosis has never been contested throughout the hearing or the ALJ's decision. Dr. Nagle's diagnosis was given full credit and was a basis in the ALJ's decision to determine Callahan's impairment severe. Accordingly, this letter was also cumulative.

Dr. LeCompte's letter is diametrically at odds with her treatment notes. During her evaluation and treatment of Callahan, Dr. LeCompte relied on her assessments, diagnostic tests, and Callahan's subjective history to determine that there were conflicting diagnoses. However, as previously discussed, she concluded that she would

not support a declaration of disability on Callahan's behalf multiple times.  In her letter,

Dr. LeCompte states that Callahan was "inadequately treated for . . . active epilepsy

[and] . . . he would not have been able to work during the period that he has

complained of these episodes, ranging back almost 15 years."  T. 719.  This

retrospective decision was contrary to the medical records and diagnostic tests, which

were concurrently documented during the period in question.  It was not error,

therefore, to discount it.  Herrera v. Barnhart, 210 Fed. Appx. 635, 636 (9th Cir. 2006)

(finding that there was no error where the ALJ ignored "either of [the claimant's] treating

physicians [conclusions] that she was disabled as of the date she was last insured, [as]

these opinions were purely retrospective and conflicted with other substantial medical

evidence in the record.") (citing Johnson v. Shalala, 60 F.3d 1428, 1433 (9th Cir.1995),

and Magallanes v. Bowen, 881 F.2d 747, 754 (6th Cir. 1989)).  As there was other

substantial evidence in the record supporting the conclusion of disability, this was not

likely to change the Commissioner's decision and thus was not probative.


## VI. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that the Commissioner's decision denying disability benefits

be **AFFIRMED**.

Pursuant to 28 U.S.C. §636(b)(1), the parties may lodge written objections to the

foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE**

**TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE**

**APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v.

Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. §636(b)(1); Fed

R. Civ. P. 72, 6(a), 6(e).


DATED:  May 5, 2011
        Albany, New York

United States Magistrate Judge

35